IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH KENTON McGOWEN, | § | |
| | § | |
| *Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-0655 |
| | § | |
| NATHANIEL QUARTERMAN, | § | |
| | § | |
| *Respondent*. | § | |

## MEMORANDUM OPINION AND ORDER

Joseph Kenton McGowen, a state inmate represented by counsel, seeks habeas corpus

relief under 28 U.S.C. § 2254 challenging his murder conviction. Respondent filed a motion

for summary judgment with a copy of the state court record. (Docket Entries No. 7, 9.)

Petitioner filed a response. (Docket Entry No. 8.)

Based on consideration of the pleadings, the motion and response, the record, and the

applicable law, the Court **GRANTS** summary judgment and **DISMISSES** this action.

## I.  PROCEDURAL BACKGROUND

A jury found petitioner guilty of murder and assessed punishment at twenty years

confinement under cause number 647,853 in the 232nd District Court of Harris County,

Texas. The conviction was affirmed on appeal. *McGowen v. State*, No. 01-02-00416-CR

(Tex. App. – Houston [1st Dist.] 2003, pet. ref'd) (not designated for publication). The

Texas Court of Criminal Appeals refused discretionary review, *McGowen v. State*, PDR No.

1234-03, and denied petitioner's state habeas application without a written order. *Ex parte McGowen*, No. 64,371-01.

Petitioner complains of ineffective assistance of trial counsel in the following instances:[1]

(1)     failure to impeach witness Jaques with her prior inconsistent statements;

(2)     failure to cross-examine witness Edwards as to motive and bias;

(3)     failure to object to jury instructions and charge; and

(4)     failure to object to the State's closing argument.

Respondent argues that these claims fail as a matter of law.

## II.  FACTUAL BACKGROUND

The state appellate court set forth the following statement of facts in its opinion:

On August 25, 1992, appellant, a Harris County Deputy Sheriff, shot and killed [Susan] White in her home while appellant was executing a warrant for her arrest on a felony charge of retaliation. Appellant arrived at White's house around 12:30 a.m. and was accompanied by Deputies Malloy and Morong. The deputies first knocked on White's door and announced that they were from the Harris County Sheriff's Department, but White refused to open the door when she recognized appellant's voice. She asked the deputies for identification and told them that she would open the door only after appellant had left her property; however, appellant did not leave. White called 9-1-1.

Appellant then contacted his supervisor by radio and obtained permission to break down the door. The deputies ran to the rear door of the house, and Deputy Malloy kicked the door open, triggering the burglar alarm. Appellant first entered White's house with his gun drawn, tailed by Deputies Malloy and

---

[1]In his response to the motion for summary judgment, petitioner withdrew two other instances of ineffective assistance of counsel originally raised in his petition.

2

Morong, and, within seconds, came to White's bedroom. Appellant stood inside the doorway of White's bedroom and said three times, 'Put the gun down.' He then immediately fired three shots. The first shot grazed White's face and traveled through the side of her nose. The second shot entered her chest. [The] third shot traveled through her right arm and entered the right side of her chest. After firing the shots, appellant told Deputy Malloy, 'You heard me tell her to put the gun down.' None of the other deputies saw White prior to the shooting. The deputies entered the bedroom and saw White's body on the bed. Deputy Morong retrieved a gun on the bed next to White's body. Deputies Malloy and Morong then handcuffed White's son, Jason Aguillard, who was upstairs on the telephone calling a 9-1-1 operator. White later died from the gunshot wounds.

Testimony at trial revealed that appellant had actively sought the arrest warrant against White and had manufactured many of the facts supporting probable cause in order to obtain the warrant. Appellant had previously arrested Aguillard after convincing Aguillard's friend, Michael Schaffer,[2] to obtain confidential information on Aguillard and to set up Aguillard for helping to facilitate the sale of a stolen gun between Shaffer and another minor. After this arrest, White made several complaints to appellant's supervisor, claiming that appellant was continually harassing both her and her son and had arrested Aguillard only because she had spurned appellant's sexual advances. White filed no formal complaints of sexual harassment against appellant.

After he was arrested, Aguillard told White his suspicion that Schaffer had set him up, and White made a phone call to Schaffer's mother, telling her, 'Informants don't live long in Houston.' White also left a message with Schaffer's aunt, stating the same thing. Schaffer told appellant about the telephone conversation between White and Shaffer's mother, but maintained that neither he nor his family felt that White's comment was a direct threat.

Appellant then contacted the Harris County District Attorney's Intake Division and gave false information about White to obtain an arrest warrant for retaliation against Shaffer. Appellant told the prosecutor that Aguillard was the head of a gang that was building and selling automatic weapons.

---

[2]The state appellate court refers to Michael as "Shaffer" and "Schaffer" throughout its opinion. The trial record and pleadings reflect his name as "Shaffer."

Appellant also stated that White had called Schaffer's mother and had told her that White was going to kill Schaffer because Schaffer had had White's son arrested and that Schaffer would be dead before the day was over. When the prosecutor asked appellant if White should be taken seriously, appellant falsely responded that there had been prior reports of gunfire at White's house and that deputies had once taken a gun away from White at her house. Before the prosecutor would file charges against White, the prosecutor told appellant that he must get confirmation of these threats from Schaffer's mother. After appellant had left several messages with Schaffer's mother, Schaffer's mother contacted appellant and confirmed that White had told her that 'Informants don't live long in Houston.' Appellant went back to the District Attorney's Intake Division, talked to a different prosecutor, and again attempted to obtain a warrant against White. Appellant told the prosecutor that White had threatened Schaffer, that White knew that Schaffer was the informant, and that another unknown individual had threatened Schaffer with a gun. [FTN. Schaffer had told appellant that, after Aguillard was arrested, Schaffer had been followed by an unidentified man with whom he had had a previous altercation. Schaffer claimed that this man, who had pulled a gun on him on a prior occasion, had followed Schaffer home on the night of the arrest. The previous altercation between Schaffer and this unidentified man was unrelated to the events of this case.] Appellant attempted to convince the prosecutor that all of these events were related. Appellant also stated that White had threatened retaliation in an attempt to protect Aguillard, who had purchased a fully-automatic Uzi. Appellant stated several times that he personally wanted to execute the warrant for White's arrest. The prosecutor who approved the warrant testified that he would not have prepared the warrant had he known that appellant had manufactured these facts.

*McGowen*, at *1-2.

## III.  THE APPLICABLE LEGAL STANDARDS

This petition is governed by applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254.  Under the AEDPA, federal relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme

4

Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411.

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the

presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 330-31.

## IV. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI. A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 687. The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996). To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere

error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland,* 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell,* 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

Petitioner alleges four instances of ineffective assistance of counsel, each of which is addressed separately, below.

A.    Failure to impeach Jeannie Jaques

In obtaining the warrant for White's arrest, petitioner executed the following affidavit of probable cause:

> Complaint has been made by the undersigned affiant who says under oath that he has good reason to believe and does believe that in Harris County, Texas, Susan White, hereinafter styled the defendant, heretofore on or about August 23, 1992, did then and there unlawfully[,] intentionally[,] and knowingly harm and threaten to harm Michael T. Shaffer by an unlawful act, namely, by threatening to cause the death of Michael T. Shaffer, in retaliation for and on account of the service of Michael T. Shaffer as an informant.

PROBABLE CAUSE

Affiant, J. McGowen, is a credible and reliable person who is reputably employed as a peace officer with the Harris County Sheriff's Department. Affiant believes and has reason to believe that the Defendant Susan White committed the offense of retaliation in Harris County, Texas on August 23, 1992.

Affiant spoke with Jeannie Jaques, who Affiant believes to be a credible and reliable person[,] who stated that on August 23, 1992 she spoke with Susan White, a person who Jaques knows.  Jaques told Affiant that she spoke with Defendant on the phone, at Defendant's residence in Harris County, Texas. During that conversation the *Defendant told Jaques that she (Defendant) knew that Jaques'[s] son was an informant* who set up Defendant's son while acting as an informant and that 'informants in Houston don't live long.'  *Jaques believed that White intended to inflict serious harm or death on her son* as a result of the statement made to her.

Affiant knows Jaques'[s] son and knows that he acted as an informant on August 22, 1992 in which the Defendant's son was arrested.

*McGowen*, p. 71 (emphasis added).

According to petitioner, a key issue at trial was whether he was untruthful in attesting to the italicized portions of the above affidavit in order to obtain the warrant for White's arrest.  Petitioner claims that underlying this issue is whether White told Jaques that her son, Michael Shaffer, was the informant, and whether Jaques and Shaffer considered White's statement – "Informants do not live long in Houston" – to be a personal threat.  (Docket Entry No. 1, p. 21.)  Petitioner claims that proof that Jaques and Shaffer considered White's statement to be a threat would support the truthfulness of his probable cause affidavit and the validity of the ensuing arrest warrant.

8

At trial, Jaques testified that her sister, Sherry Maultsby, had called her one Sunday morning in August of 1992, and that the call led her to believe that Michael was in trouble in Houston. R.R. Vol. 3, pp. 36-37. Jaques lived in Austin at the time. She called Michael, who told her that "there [was] not anything going on. That he [was] not in trouble." *Id.*, p. 38. Michael then set up a telephone call between Jacques and Susan White, and silently listened in on the call. *Id.*, p. 39. During the call, White expressed concern that she was unable to locate Michael or her own son, that their two sons had been arrested, and that "there was an informant involved." *Id.* p. 41. The trial record shows the following relevant exchanges between Jaques and the prosecutor regarding this call:

> THE STATE:      Now, as you continued the conversation with [White], do you all talk anymore about Michael and what he is doing?
>
> JAQUES:   No, not really. She is still curious as to where he is; and, you know, what was going on with him.
>
> THE STATE:      And during that conversation, does she ever say anything that strikes you as odd or concerns you or anything of that nature?
>
> JAQUES:   Yes, she did. She made a comment about informants not living long in Houston.
>
> THE STATE:      Was Michael's name associated with that?
>
> JAQUES:   No.
>
> THE STATE:      And when she said that, what did you say?
>
> JAQUES:   Well, I told her that I didn't think she should be saying that. Somebody could hear her.

THE STATE:          Did she have a response to that?

JAQUES:     Not really.  There was no response.

THE STATE:          Did she comment or explain what her comment was?

JAQUES:     A little bit.  She said it wasn't intended, you know, directly.  It was just a figure of speech.  I don't know if those were her exact words, but it was like she was trying to brush off what she said.  That it didn't mean directly to anybody.

*Id.*, pp. 41-42.  After White ended the call, Jaques and Michael continued their conversation, as shown by Jaques's testimony:

THE STATE:          And what is Michael telling you?

JAQUES:     He says, 'Mom, there isn't anything going on.  I just got picked up.  I was released.  There is nothing against me.'  And he said he was going to, you know, see what he could find out.

THE STATE:          Did you ask him anything about the confidential informant?

JAQUES:     I asked him if he knew anything about it.

THE STATE:          And what did he tell you?

JAQUES:     No.

THE STATE:          Okay.  Other than Ms. White's comment that a confidential informant was involved somehow in this investigation, did she make any other comment about the confidential informant?

JAQUES:     No.  Just that one statement.

THE STATE:          Okay.  And tied with the statement about the CI's don't live long?

JAQUES:      Right.

*Id.*, pp. 44-45.  The exchange continued, revealing Jaques's lack of any strong concerns

regarding the conversations or events in Houston:

> THE STATE:        At the conclusion of that conversation with Michael and
> Susan White, ha[d] you formed any opinions as to what's going on down in
> Houston?
>
> JAQUES:      No.  Well, except that maybe there is a few things missing that
> I haven't been told.  That's what I felt like.
>
> THE STATE:        Had you developed any concerns at that point?
>
> JAQUES:      Not enough to get up and drive to Houston.  No, sir.

*Id.*, p. 45.  Jaques then testified as to her conversation with petitioner the next day regarding

her telephone calls with Susan White and Sherry Maultsby:

> THE STATE:        What was the topic he was interested in?
>
> JAQUES:      Well, he wanted to know everything that was said and wanted
> to know about the comment that I said that Susan made about informants don't
> live long in Houston. . . . He asked me if I was afraid or if I was scared.  I
> don't remember his exact words.
>
> THE STATE:        What did you tell him?
>
> JAQUES:      No.  And I asked him, 'Was I supposed to be?'
>
> THE STATE:        What did he say?
>
> JAQUES:      He didn't really – I don't remember him responding to that
> comment.

*Id.*, pp. 50-51.

11

THE STATE:          And I want to ask you specifically.  Did Susan White tell you at any time during her conversation that she knew that your son was an informant who had set up her son while acting as an informant and that informants don't live long?

JAQUES:     No.  No, sir.

*Id.*, p. 53.

Petitioner asserts in the instant case that, "The State contended [at trial] that petitioner's [probable cause] affidavit was false because, when Jaques spoke to petitioner, she did not know that Shaffer was the informant, and neither she nor Shaffer considered White's statement as a threat."  Petitioner argues that, in light of Jaques's testimony, trial counsel failed to impeach her with the following three alleged inconsistent statements:

(1)     In her sworn statement given to police on September 3, 1992, Sherry Maultsby (Jaques's sister), told police that White had told Maultsby that she thought Michael Shaffer had "set up" White's son, that she believed Shaffer was "an informant," and that an informant in Houston is a dead person.  Maultsby then called Jaques and "told her this." (*McGowen*, p. 85; Petitioner's State Habeas Exhibit 4.);

(2)     In her tape-recorded interview of September 29, 1992, Jaques told the prosecutor and an investigator that she interpreted White's comment, in part, to mean that White would "see to it that an informant doesn't live long," and that she felt that White was indirectly threatening her son, Michael Shaffer (*McGowen*, Petitioner's State Habeas Exhibit 6, p. 13); and

(3)     In his tape-recorded interview of September 4, 1992, Shaffer told the prosecutor that Jaques told him that she was worried about him as a result of White's threat and did not want him to get hurt (*McGowen*, Petitioner's State Habeas Exhibit 7, p. 21).

12

In his affidavit submitted on collateral review, trial counsel testified that:

> I have been asked to explain why I did not call Sherry Maultsby to impeach
> Jeannie Jaques'[s] testimony that she did not know that Michael Shaffer was
> the informant until two weeks after White was killed, when district attorney's
> investigator Steve Clappart told her. Maultsby told the police and Clappart
> that she told Jaques before the fatal accident that Susan White told her that
> White thought that Shaffer was the informant and, in Houston, an informant
> is a 'dead person.' I did not know during the trial that Maultsby made this
> particular statement to Jaques.   It is possible that I did not read Maultsby's
> written statement to the police or the transcript of her recorded interview with
> Clappart, as the State closed its file to the defense after McGowen refused to
> accept a plea bargain. If I read these statements before the file was closed, I
> did not appreciate their significance at the time or had forgotten about them by
> the time of trial. My failure to impeach Jaques on this matter was not strategic.

*McGowen*, pp. 297-98.

Maultsby's September 3, 1992 sworn statement was not specific as to what she

actually told Jaques, and it did not directly contradict Jaques's trial testimony.  A review of

the statement shows that, according to Maultsby, White told her that she thought Michael and

her son, Jason, were in jail, and that,

> her son was in jail because Michael had called [him] and asked him to meet
> him. She said that Jason said he could not meet with Michael because he had
> a date.  She then said that Jason was driving and just happened to see Michael
> in a parking lot and stopped to talk to him. She said that some guy that Jason
> didn't even know was there and that this guy threw a gun into some bushes.
> Michael went and got the gun and gave the money to Jason to give to the other
> guy which Jason did. Then, there were cops everywhere.

*McGowen*, p. 86.

Maultsby said that White thought Michael had set Jason up and that she really

believed that he was an informant, and that White told her, "I think Michael is an informant

13

and in Houston, an informant is a dead person." *Id*. White added, "I don't mean me, informants are dead people in Houston. That's just the way things are in Houston." Maultsby had responded with, "That's the way things are everywhere." White also told Maultsby that Michael owed her $400.00, had stolen her jewelry, that White was going to file theft charges, and that her allowing Michael to stay at her house had caused her marriage to break up. Maultsby stated that she called Jaques "and told her this and also expressed my opinion that something in this story didn't jive and was weird." *Id*. Maultsby made it clear in her statement that, "At no time did I tell my sister 'Susan White left a message on my answering machine stating informants in Houston get killed.' Nowhere in any conversation that I was involved in was the word 'killed' used." *Id*. She further stated, "I did not take it as a direct threat when she said that informants in Houston are dead. It made me worry because I know what happens to people who are informants and because I didn't know Susan White and what she was capable of . . . I don't know Deputy Joseph McGowen and never talked to him directly. I never talked to anyone from the Sheriff's Department in Houston until someone called me on Tuesday, September 1st." *Id*., p. 87. By stating that she called Jaques "and told her this," Maultsby does not identify *what* she told Jaques. No where in her affidavit did she affirmatively state that she told Jaques that White believed Michael was an informant. Accordingly, and contrary to petitioner's argument, Maultsby's statement did not directly impeach Jaques's testimony that she did not know Michael was the informant until after White's death.

14

To the extent petitioner faults counsel for not calling Maultsby as a witness to prove that she did tell Jaques that White believed Michael was the informant, his claim is one of an "uncalled or omitted witness." To demonstrate the required *Strickland* prejudice regarding uncalled witnesses, petitioner must show not only that the testimony would have been favorable, but also that the witness was available for, and would have testified at, trial. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002). A habeas petitioner cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim. *Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir. 1983) (conclusory allegations of ineffective assistance of counsel are insufficient to warrant relief).

Nor does petitioner establish ineffective assistance in counsel's failure to use, or attempt to use, Jaques's September 9, 1992 recorded interview for impeachment purposes. In the interview, Jaques was asked whether she felt threatened by White's comment to her regarding informants. Jaques agreed that White had seemed to be "just a mother who's [sic] son had been arrested and she was trying to find out why." Jaques stated that she "didn't think [White] was going to go out and get a shot gun and blow anybody away." Petitioner specifically draws the Court's attention to the following transcribed interview exchanges:

> Q:   [White's] statement that informants don't live long in Houston, did you feel like she was saying I will see to it that an informant doesn't live long or was that just kind of a statement of fact?
>
> A:   That was, I don't know, I, I read a little bit into it myself. I would say it was a little bit of both. It was a statement of fact but also it was like ah, I, I particularly want you to hear this you know.

Q:    Um huh.

A:    That's, I mean, but like I said I did not feel like I should you know, I
      did ask, I did ask my son to leave.  I asked my son to go visit his dad,
      I mean I was that much concerned.  But, nothing that I felt I should rush
      down to Houston and you know.

Q:    Well.

A:    Take him away.

Q:    Was there any intimation that, that she knew that Michael was a, was
      an informant?

A:    Well, just the fact that she said some Lt. [sic] had told her.

Q:    Did you feel like she was threatening Michael, your son?

A:    In a round about way, yes I did.

Q:    But it, was it a direct threat?

A:    No, it was not a direct threat.

*McGowen*, p. 117.  Petitioner argues that these interview statements should have been used

to impeach Jaques's trial testimony that she did not consider White's comment a threat.

      In his affidavit submitted to the state court on collateral review, trial counsel testified

in relevant part as follows:

> I have been asked to explain why I did not impeach Jeannie Jaques with
> specific prior inconsistent statements she made to law enforcement regarding
> Susan White's threats to harm Michael Shaffer.  Although I questioned her
> about this subject, I did not impeach her with the prior inconsistent statements
> referred to in the habeas corpus application.  My failure to elicit this testimony
> was inadvertent rather than strategic.

*McGowen*, pp. 297-98.

    A review of the record shows that trial counsel did impeach Jaques's testimony, as revealed by the following cross-examination exchanges:

> DEFENSE COUNSEL:   Will you agree with me that you were at least somewhat concerned after your conversation with Ms. White?
>
> JAQUES:   Still a little concerned, yes.

R.R. Vol. 3, p. 74.

> DEFENSE COUNSEL:   Will you agree with me that you were a little concerned although not totally fearful for [your son's] life, right?
>
> JAQUES:   Right.

*Id.*, p. 76.   Similarly, trial counsel cross-examined Jaques regarding her telephone conversation with petitioner:

> DEFENSE COUNSEL:   And did [petitioner] ask you if you felt like you had been threatened or that Michael had been threatened?
>
> JAQUES:   Yes.
>
> DEFENSE COUNSEL:   And didn't you tell him yes in a roundabout way?
>
> JAQUES:   In a roundabout way.

*   *   *   *

> DEFENSE COUNSEL:   I guess my point is you did not say, 'No.  I don't feel like he was threatened.'  Will you agree with me?
>
> JAQUES:   I will agree with you.  [My son] was in Houston.  I was in Austin.

17

\*   \*   \*   \*

DEFENSE COUNSEL:      In fact, when he told you that he was going to have [White] arrested, do you remember what you said?

\*   \*   \*   \*

JAQUES:      I said that was great.

\*   \*   \*   \*

DEFENSE COUNSEL:      What else did you say?

JAQUES:      That it would take some worry off my mind.

*Id.*, pp. 79-80.

DEFENSE COUNSEL:      I am on page 10 of your telephone interview with [investigator] Clapper.[3]  Read this silently to yourself . . . . Will you agree with me that your told Mr. Clapper back in, I think it was September of 1992 that if you would have known, in fact, that your son was the informant, then you would have been more upset than you were.  Will you agree with me?

JAQUES:      I agree with you, yes.

*Id.*, p. 85.  Counsel further cross-examined Jaques as to her emotional response to White's comment regarding informants:

DEFENSE COUNSEL:      Did [White's comment] concern you?

JAQUES:      Just a little bit.

DEFENSE COUNSEL:      Have you testified previously under oath, ma'am, that it, in fact, did concern you?

---

[3]Stephen Clappert is referred to throughout the state court record as "Clappert," "Clappart," and "Clapper."  His correct name is unclear from the record.

18

JAQUES:      I believe I said just a little bit.

    DEFENSE COUNSEL:      May I approach?

    THE COURT:      Yes, sir.

DEFENSE COUNSEL:      On page 1130 of your prior trial or prior hearing testimony, [l]ine 22.

    'QUESTION:      Did it concern you?'

    'ANSWER:  Yes, it concerned me.'

JAQUES:      Yes.  It is there in my testimony.

DEFENSE COUNSEL:      You didn't say, ma'am, it concerned you a little bit or just a tiny bit.  You said, 'Yes it concerned me,' right?

JAQUES:      Yes.

DEFENSE COUNSEL:      Did it scare you?

JAQUES:      A little bit.

DEFENSE COUNSEL:      Once again.

JAQUES:      Yes, it did.

DEFENSE COUNSEL:      So previously, ma'am, you will at least agree with me that you have testified under oath it did scare you; and it did concern you. Will you agree with me?

JAQUES:      Yes.

*Id.*, pp. 87-88.

    This Court's careful review of the transcript of Jaques's transcribed interview with

Clappert and counsel's cross-examination of Jaques at trial reveals that counsel effectively

19

cross-examined and impeached Jaques regarding her prior inconsistent statements. The substance of Jaques's omitted statements referenced by petitioner in her Clappert interview was covered by counsel's cross-examination. Counsel elicited testimony regarding the varying degrees of "threat" and "concern" voiced by Jaques at different times. Counsel's additional cross-examination of Jaques with the specific statements referenced by petitioner would have been cumulative of his existing cross-examination, and would have added little, if anything, to his impeachment efforts. Even assuming counsel was deficient in failing to pursue the additional impeachment, petitioner fails to show that but for the absence of such additional cross-examination, there is a reasonable probability that the result of his trial would have been different.

Nor does petitioner demonstrate ineffective assistance of counsel regarding his failure to impeach Jaques with Shaffer's transcribed interview statement. Petitioner argues that counsel should have impeached Jaques with her son's statement that, "Yeah, my mom said she told me she was worried about me, you, know, what's going on up there. I don't want you to get hurt. You know." *McGowen*, Petitioner's State Habeas Exhibit 7, p. 21.

A review of Michael's statement in context shows that his complete answer to the prosecutor's transcribed interview question was as follows:

> MICHAEL:  Yeah, my mom said she told me she was worried about me, you know, what's going on up there, I don't want you to get hurt. You know.
>
> PROSECUTOR:     Um kay.

20

> MICHAEL:   She didn't say [White's] going to come and kill you, you know. What if, I'm afraid she's going to do something to you, she didn't say nothing like that to me.

*McGowen*, p. 148.

The record shows that counsel effectively covered the content of Michael's statement during cross-examination of Jaques at trial:

> DEFENSE COUNSEL:     Will you agree with me that you were at least somewhat concerned after your conversation with Ms. White?
>
> JAQUES:     Still a little concerned, yes.

R.R. Vol. 3, p. 74.

> DEFENSE COUNSEL:     Will you agree with me that you were a little concerned although not totally fearful for [your son's] life, right?
>
> JAQUES:     Right.

*Id.*, p. 76.

> DEFENSE COUNSEL:     And did [petitioner] ask you if you felt like you had been threatened or that Michael had been threatened?
>
> JAQUES:     Yes.
>
> DEFENSE COUNSEL:     And didn't you tell him yes in a roundabout way?
>
> JAQUES:     In a roundabout way.

*Id.*, p. 79. Counsel further elicited testimony from Jaques that, while she was not concerned with White's comment enough to drive to Houston to check on her son, she did ask him to go stay with his father. *Id.*, p. 74. Jaques admitted under counsel's cross-examination that knowing of petitioner's plans to arrest White "[took] some worry off my mind." *Id.*, p. 80.

21

The totality of counsel's cross-examination shows that counsel effectively established Jaques's concerns for her son after White's comment. Counsel's additional cross-examination of Jaques with Michael's statement would have been cumulative of his existing cross-examination, and would have added little, if anything, to his impeachment efforts. Even assuming counsel was deficient in failing to pursue the additional impeachment, petitioner fails to show that but for the absence of this additional cross-examination, there is a reasonable probability that the result of his trial would have been different.

In denying habeas relief, the state court found as follows:

> [T]he Court has reviewed the contents of the official trial court records and the appellate record in cause number 647853; the credible affidavits of EDWARD C. PORTER, DAN COGDELL, SHERRY MAULTSBY, and STEPHEN C. CLAPPART; the written statement of JEANNIE JACQUES [sic]; and the diary of SUMMER EDWARDS, and enters the following findings of fact and conclusions of law, based upon the evidence, the trial court's personal recollection, and the totality of trial counsel's overall representation in cause number 647853:

> 1.   Trial counsel's failure to question Jeannie Jacques [sic] with her prior inconsistent statement was not ineffective;

> *    *    *    *

> 4.   Applicant has failed to demonstrate that his conviction was improperly obtained.

*McGowen*, p. 4, Supplemental Transcript.

The state habeas court denied relief on this issue. Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. No

basis for habeas relief is shown, and respondent is entitled to summary judgment on this issue.

### B.    Failure to cross-examine Summer Edwards

Summer Edwards dated petitioner for a few months after White's death.  At trial, Edwards testified that  petitioner made disparaging statements about White and said that he meant to kill her because of her attempts to cause him trouble at work and at home.  R.R. Vol. 6, p. 126. Under trial counsel's cross-examination, Edwards also testified that petitioner told her that he shot White in self-defense when White tried to kill him.  *Id.*, p.138.

Petitioner claims that the State disclosed a copy of Edwards's diary to trial counsel following direct examination, and that counsel failed to read it thoroughly and use it for cross-examination.  He argues that the diary reflects Edwards's anger when petitioner ignored her and denied that he was the father of the child she was carrying. Petitioner claims that had counsel elicited this testimony, the jury would have had ample reason not to believe any of her testimony.  (Docket Entry No. 8, p. 5.)

In his affidavit submitted to the state court on collateral review, trial counsel testified in relevant part as follows:

> I have been asked to explain why I did not question Summer Edwards about matters relevant to her bias and motive to testify against McGowen.  She kept a diary in which she expressed anger at him due to his lack of attention after she told him that she was pregnant with his child.  Her diary was not disclosed to me until the completion of her direct examination.  I skimmed it briefly, noticed entries consistent with her testimony, and decided not to question her about anything written in the diary.  Although my decision not to question her about anything written in the diary was strategic, it was made without having

read the diary thoroughly. In retrospect, I could have questioned her about this subject without even referring to the diary.

*McGowen*, pp. 298-90. In a second affidavit appearing in the state habeas record, counsel

testified that:

> I have had an opportunity to review the entirety of Summer Edwards['s] diary since trial. I did not have such an opportunity during trial. The diary is 52 pages of hand written, single spaced entries[.] A review of the diary is revealing. While there is clearly much negative information in the diary (i.e. consistent with the State's theory that McGowen had 'confessed' to her), there is also a great deal of favorable information as well[.] It is clear that Edwards had a great deal of feeling for McGowen (she details her affection, sexual appetite and admiration for him in detail on numerous occasions in the diary). Those areas could have been explored on cross-examination without referring directly to her journal entries. It is also very clear that Summer's animus and bias against McGowen began to harden after discovering she was pregnant by him and his initial equivocation (and later rejection) about the decision concerning the unborn child[.] Had an opportunity for thorough review of the diary been provided, the cross-examination of Summer would have specifically explored those areas of bias (i.e. rejection by McGowen of Summer) and motive for testifying against him.

*McGowen*, p. 400.

Respondent argues that counsel was not ineffective because the trial court prevented

counsel from thoroughly reviewing the diary. Counsel testified in his habeas affidavits that,

"I have had an opportunity to review the entirety of Summer Edward's diary since trial. I did

not have such an opportunity during trial," and that he would have used the diary "[h]ad an

opportunity for thorough review of the diary been provided[.]" *Id*. Counsel was unable to

review the diary before that time because "[h]er diary was not disclosed to me until the

completion of her direct examination." *Id.*, p. 290.  Respondent states, and the record shows, that,

> Trial counsel asked for 15-20 minutes to review the diary, before he knew how long it was.  The trial court allowed him only a 15 minute recess.  When he returned to court he stated that he did not have a chance to read all of the diary. [R.R. Vol. 6, p. 139].  The trial court did not extend the recess for further review.

(Docket Entry No. 7, p. 37.)  Petitioner did not complain on direct appeal or collateral review of the trial court's time limitation on counsel's review of the diary, and such unexhausted collateral issue is not before this Court.  Nor did petitioner raise and exhaust a complaint that counsel was ineffective in failing to request a second recess or additional time to complete a thorough review of the diary.

The record shows that counsel's inability to thoroughly review the diary was due to the trial court's fifteen-minute limitation on his time for reviewing the item.  Counsel testifies that, "Had an opportunity for thorough review of the diary been provided, the cross-examination of Summer would have specifically explored those areas of bias (i.e. rejection by McGowen of Summer) and motive for testifying against him."  The record does not disclose, and petitioner presents no probative summary judgment evidence to the contrary, that, based on an adequate and thorough review of the diary, counsel elected not to use the diary for impeachment purposes.

In denying habeas relief on this issue, the state court found as follows:

> [T]he Court has reviewed the contents of the official trial court records and the
> appellate record in cause number 647853; the credible affidavits of EDWARD
> C. PORTER, DAN COGDELL, SHERRY MAULTSBY, and STEPHEN C.
> CLAPPART; the written statement of JEANNIE JACQUES [sic]; and the
> diary of SUMMER EDWARDS, and enters the following findings of fact and
> conclusions of law, based upon the evidence, the trial court's personal
> recollection, and the totality of trial counsel's overall representation in cause
> number 647853:
>
>          *     *     *     *
>
>      2.      Trial counsel's failure to question Summer Edwards to
>             establish motive and bias was not ineffective;
>
>          *     *     *     *
>
>      4.      Applicant has failed to demonstrate that his conviction
>             was improperly obtained.

*McGowen*, p. 4, Supplemental Transcript.

The state habeas court denied relief on this issue. Petitioner fails to show that the state

court's determination was contrary to or involved an unreasonable application of *Strickland*

or was an unreasonable determination of the facts based on the evidence in the record. No

basis for habeas relief is shown, and respondent is entitled to summary judgment on this

issue.

### C.     Failure to object to jury instruction and charge

Petitioner claims that trial counsel was ineffective in failing to object to a jury

instruction and charge purportedly requiring the jury to determine the validity of the arrest

warrant and recognizing "provoking the difficulty" as a limitation on petitioner's right to

self-defense. Petitioner contends that under state law, the sufficiency of the probable cause

affidavit and validity of the warrant is a question of law for the court, not an issue of fact for the jury. A review of the jury charge, however, shows that the jury was not charged with determining the validity of the arrest warrant obtained by petitioner. *McGowen*, p. 376. Moreover, provocation is recognized under state law as a limitation on a claim of self-defense. *Smith v. State*, 965 S.W.2d 509, 513 (Tex. Crim. App. 1998).

Petitioner claims that the jury charge essentially required the jury to determine the validity of the arrest warrant in order to decide whether petitioner's shooting and killing of White was legally justified. In short, he argues that the jury was erroneously instructed that it could convict petitioner of murder if he lied to obtain the arrest warrant and thereby provoked the difficulty, even though he shot White in self-defense.[4] Petitioner misconstrues the jury charge. The trial court charged the jury that,

---

[4]Petitioner's argument presumes that he shot White in self-defense because she pointed a gun at him; White's actions, however, were disputed at trial. Petitioner cannot show *Strickland* prejudice because he cannot discount that the jury simply refused to believe his testimony that White aimed a gun at him. Moreover, the state court of appeals held that, "The record shows that, whatever his motive, appellant manufactured the facts that were pertinent to obtaining the warrant to arrest White for retaliation. Without a warrant or probable cause, appellant did not have the legal right to enter White's house. Appellant shot White while executing an unlawful arrest, after having lied in order to obtain the arrest warrant and to gain access to White's house." The appellate court further held that, "[T]he overwhelming evidence showed that appellant knowingly lied in order to obtain an arrest warrant to enter White's house and that he shot White while executing this unlawful arrest." *McGowen*, at *9. That petitioner forcibly entered White's house and ran to her bedroom armed with a firearm was sufficient under state law to warrant submission of the provocation charge to the jury. *See Smith*, 965 S.W.2d at 513.

> Now, therefore, if you believe from the evidence beyond a reasonable doubt that in Harris County, [McGowen], in the State of Texas, on or about the 25th day of August, 1992, did then and there intentionally or knowingly cause the death of Susan White, by shooting her with a deadly weapon, namely a firearm, as alleged in the indictment, but you further find from the evidence, or have a reasonable doubt thereof, that [McGowen] was a peace officer and reasonably believed that the force when and to the degree used, if it was, was immediately necessary to make or assist in making an arrest, *and [McGowen] reasonably believed the arrest was lawful,* and before using force, if any, [McGowen] manifested his purpose to arrest and identified himself as a peace officer, unless [McGowen] reasonably believed his purpose and identity were already known to Susan White, the person to be arrested, and you further believe or have a reasonable doubt thereof, that [McGowen] reasonably believed that the conduct for which arrest was authorized included the use or attempted use of deadly force, or [McGowen] reasonably believed there was a substantial risk that the person to be arrested would cause death or serious bodily injury to [McGowen] or another if the arrest was delayed, bearing in mind that a peace officer is under no duty to retreat before using deadly force, then you will acquit [McGowen] and say by your verdict not guilty.

*McGowen*, pp. 205-06 (emphasis added). In determining whether McGowen reasonably believed the arrest was lawful, the jury was instructed that,

> If the [probable cause] affidavit contains false statements, *if the affiant knows that the statements are false*, and if the statements are necessary to establish probable cause to believe that the accused committed the offense alleged, then a warrant based on that affidavit would be invalid.

*Id.*, pp. 202-03 (emphasis added). Consequently, and as shown by the italicized portions of the charge and instructions, the jury was not required to determine the validity of the arrest warrant, but rather, was required to determine whether *McGowen* reasonably believed the arrest was lawful.

Continuing, the trial court instructed the jury that, in the alternative,

If you find from the evidence, however, beyond a reasonable doubt, that at the time and place in question [McGowen], acting as a peace officer, did not reasonably believe that force when and to the degree used, if it was, was reasonably necessary to make or assist in making an arrest, that is, [McGowen] did not reasonably believe that the arrest was lawful, or if you find from the evidence beyond a reasonable doubt at the time and place in question [McGowen], acting as a peace officer, believed that the arrest was lawful, but before using force [McGowen] did not manifest his purpose to arrest and identify himself as a peace officer unless it could be reasonably believed that his purpose was already known to Susan White or could not have been reasonably made known to her, or if you find from the evidence, however, beyond a reasonable doubt, that at the time and place in question [McGowen], acting as a peace officer, believed that the arrest was lawful and before using force [McGowen] manifested his purpose to arrest and identified himself as a peace officer, or he reasonably believed that his purpose and identity were already known by Susan White, or could not reasonably be made known to her, but [McGowen] did not reasonably believe the conduct from which the arrest was authorized included the use or attempted use of deadly force by the person to be arrested or [McGowen] did not reasonably believe that there was a substantial risk that the person to be arrested would cause death or serious bodily injury to [McGowen] or another if the arrest was delayed, *then you must find against [McGowen] on the use of deadly force by a peace officer, and next consider whether [McGowen] had the right of self-defense.*

*Id.*, pp. 206-07 (emphasis added).   The trial court then charged the jury on the issue of self-

defense, as follows:

Now, if you find from the evidence beyond a reasonable doubt that [McGowen] did cause the death of Susan White by shooting her with a firearm as alleged, but you further find from the evidence, as viewed from the standpoint of [McGowen] at the time, that from the words or conduct, or both, of Susan White, it reasonably appeared to [McGowen] that his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of Susan White, and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against Susan White's use or attempted use of

29

unlawful deadly force, he shot Susan White with a firearm and that a reasonable person in [McGowen's] situation would not have retreated, then you should acquit [McGowen] on the grounds of self-defense; or if you have a reasonable doubt as to whether or not [McGowen] was acting in self-defense on said occasion and under the circumstances, then you should give [McGowen] the benefit of that doubt and say by your verdict, not guilty.

If you find from the evidence beyond a reasonable doubt that at the time and place in question that [McGowen] did not reasonably believe that he was in danger of death or serious bodily injury, or that a reasonable person in [McGowen's] situation would have retreated before using deadly force against Susan White, or that [McGowen], under the circumstances as viewed by him from his standpoint at the time, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against Susan White's use or attempted use of unlawful deadly force, then you should find against [McGowen] on the issue of self-defense.

*Id.*, p. 209.  The jury was then instructed and charged on the law of "provoking the

difficulty," or "provocation," as follows:

You are further instructed as part of the law of this case, and as a qualification on the law of self-defense, that, if you find and believe from the evidence beyond a reasonable doubt, that [McGowen] immediately before the difficulty, then and there did some act, or used some language, or did both, if any, with the intent to produce the occasion to bring on the difficulty and kill Susan White, and that such conduct on [McGowen's] part if there was such, was reasonably calculated to, and did[,] provoke a difficulty, and that on such account the said Susan White attacked [McGowen] or reasonably appeared to [McGowen] to attack him, and that [McGowen] then killed the said Susan White, in pursuance of his original design, if you find there was such, or if [McGowen] provoked the difficulty that resulted in the death of the decreased, and by his own wrongful act, if any, produced a necessity for taking the life of the deceased, and you so find beyond a reasonable doubt, you will find against [McGowen's] claim of self-defense.

On the other hand, if you find that the acts done, or language used by [McGowen], if any, were not under the circumstances, reasonably calculated or intended to provoke a difficulty or an attack by the deceased upon [McGowen], or if you have a reasonable doubt thereof, then in such event,

> [McGowen's] right of self-defense would in no wise be lessened, and in such
> event you will decide the issue of self-defense in accordance with the law as
> above stated.

*Id.*, pp. 210-12.   Construed as a whole, the jury instructions and charge did not mandate

petitioner's conviction if the jury believed he lied to obtain the arrest warrant. Consequently,

counsel was not deficient in failing to raise such an objection.   The Fifth Circuit has

repeatedly held that the performance component of *Strickland* does not require counsel to

make futile motions or objections. *See Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

Regardless, counsel testified in his affidavit that co-counsel did object to the

instructions during a bench conference.   In his affidavit submitted to the state court on

collateral review, trial counsel testified in relevant part as follows:

> I have been asked to explain why the defense did not object to the jury
> instruction that, in essence, allowed the jury to determine the validity of the
> arrest warrant in deciding whether McGowen provoked the difficulty and to
> the jury instruction on provoking the difficulty as a limitation on his right to
> act in self-defense. [Co-counsel] was responsible for objecting to the charge.
> I have been advised that the record fails to reflect any objections to these
> instructions.   I believe that [co-counsel] made objections during an off the
> record charge conference.   We should have ensured that the record reflected
> these objections.   Our failure to do so was inadvertent rather than strategic.

*McGowen*, p. 299.   The state habeas court expressly found that counsel's affidavit testimony

was credible, and that petitioner failed to demonstrate that his conviction was improperly

obtained. *McGowen*, p. 4, Supplemental Transcript.

Petitioner fails to present any probative summary judgment evidence controverting

counsel's testimony that he, through co-counsel, objected to the jury instructions. Petitioner

neither raised nor exhausted a claim that counsel was ineffective in failing to ensure that the objections appeared in the record, and such collateral issue is not before this Court.

The state habeas court denied relief on collateral review, impliedly rejecting this claim of ineffective assistance of trial counsel.[5]  Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment on this issue.

D.    Failure to object to improper closing argument

Petitioner argues that trial counsel was ineffective in failing to object to the State's closing argument that petitioner forfeited his right to act in self-defense because he lied to obtain the arrest warrant.  The record shows that, during closing argument, the prosecution argued as follows:

> If you're going to go on self-defense the Defendant is entitled to it but he also cannot provoke the difficulty and he must retreat.  Let's talk about a peace officer's use of deadly force to make an arrest.  [A] [p]eace officer does not have to retreat but here is what he has to believe.  And I'll get to this a little bit more in the next slide.  He must first of all believe that the warrant is valid.

---

[5]The trial court did not enter affirmative findings on this issue.  The Court notes that in remanding petitioner's state habeas application to the trial court for entry of findings, the Texas Court of Criminal Appeals ordered the trial court to "make findings of fact as to whether counsel was ineffective for not impeaching Jeannie Jacques [sic], not cross-examining Summer Edwards, and not objecting to the State's alleged misstatement of the law.  The trial court shall also make any further findings of fact and conclusions of law it deems relevant and appropriate to the disposition of the application for writ of habeas corpus."  *Ex parte McGowen*, 2006 WL 1330919 (Tex. Crim. App. 2006).

> You have an instruction on when a warrant is valid. *If somebody swears falsely to obtain a warrant it's not a valid warrant.* The Defendant is shot out of the box on this, right from the start.

R.R. Vol. 9, p. 238-39 (emphasis added). Petitioner contends that the italicized statement was a misstatement of state law subject to objection, and that but for counsel's failure to object to the statement, the result of the trial would have been different.

In his affidavit submitted to the state court on habeas review, trial counsel testified, in relevant part, as follows:

> I have been asked to explain why I did not object to the prosecutor's argument that McGowen could not use deadly force in making the arrest because he lied to obtain the warrant. I did not realize at the time that this argument was incorrect to the extent that an arrest warrant obtained by lying is valid, if, after deleting any false statements, the rest of the affidavit states probable cause for the arrest. My failure to object was inadvertent rather than strategic.

*McGowen*, p. 300. Counsel's professed ignorance of the applicable law is inexplicable, given that the trial court instructed the jury on this issue, as follows:

> If the affidavit contains false statements, if the affiant knows that the statements are false, and if the statements are necessary to establish probable cause to believe that the accused committed the offense alleged, then a warrant based on that affidavit would be invalid.

*McGowen*, pp. 202-03. The trial court's instruction was a simple corollary to the legal principle stated in counsel's affidavit. As the prosecutor's misstatement occurred during closing argument, it stands to reason that trial counsel had already been provided, and reviewed, the jury instructions and charge.

33

Construed in context, the prosecutor's argument stated that a peace officer may use deadly force in effecting an arrest if he believes the arrest warrant is valid:

> Let's talk about a peace officer's use of deadly force to make an arrest. A peace officer does not have to retreat but here is what he has to believe. And I'll get to this a little bit more in the next slide. *He must first of all believe that the warrant is valid.* You have an instruction on when a warrant is valid. If somebody swears falsely to obtain a warrant it's not a valid warrant.

R.R. Vol. 9, pp. 238-39 (emphasis added).

Here, the prosecutor reminded the jury of the trial court's instruction on the validity of a warrant. The jury was provided a full instruction on the effect of false statements on the validity of a probable cause affidavit, and the effect on the validity of the arrest warrant. A jury is presumed to follow the instructions of the trial court. *Galvan v. Cockrell*, 293 F.3d 760, 766 (5th Cir. 2002). Nothing in the record before this Court rebuts that presumption, and no prejudice is shown by counsel's failure to object to the prosecutor's statement. To the extent the prosecutor's last sentence was an incomplete restatement of the jury instruction, petitioner fails to show that, but for counsel's failure to object to this isolated statement, there is a reasonable probability that the result of the trial would have been different.

Petitioner additionally complains of trial counsel's failure to object to the following portion of the prosecution's closing argument:

> Keep this in mind if you're going to allow that Defendant the same right of self-defense that any other citizen has[;] he has the same obligations. He cannot provoke the difficulty. *The Defendant did provoke the difficulty in this case. He swore out a false arrest warrant.* Chose to execute it himself. Made

34

> himself known to someone who is extremely fearful of him.  Chose not to use
> subterfuge or a lure to get Susan outside of her home.  Had the door kicked.
> Didn't call a supervisor or wiser head or somebody with half a brain out there
> to supervise what was going on.  Chose not to use a [SWAT] team or warrant
> team.

R.R. Vol. 10, p. 237 (emphasis added).  Trial counsel's objection to this closing argument

as a mischaracterization of the evidence was overruled.  *Id.*  Petitioner contends that the

italicized portion of the State's argument constituted a misstatement of law  by suggesting

that petitioner's swearing out a false arrest warrant provoked the difficulty and extinguished

his right of self-defense.  Petitioner takes these two sentences out of context.  The entirety

of the State's scenario constituted its argument that petitioner provoked the difficulty,

including petitioner's decisions and acts immediately before the shooting.  The State did not

limit the act of provocation to petitioner's false affidavit statements.

Under Texas law, proper closing argument by the prosecution in criminal trials fall

into four general areas: (1) summation of the evidence; (2) reasonable deduction from the

evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement.

*Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).  The complained-of portion

of the State's closing argument was a reasonable deduction from the evidence and

application of the facts to the law, as was understood by trial counsel in his objection to its

alleged mischaracterization of the evidence.  Petitioner fails to show that had counsel

objected to the argument as a misstatement of law, that the objection would have been

granted and that the result of his trial would have been different.

In denying habeas relief, the state court found as follows:

[T]he Court has reviewed the contents of the official trial court records and the appellate record in cause number 647853; the credible affidavits of EDWARD C. PORTER, DAN COGDELL, SHERRY MAULTSBY, and STEPHEN C. CLAPPART; the written statement of JEANNIE JACQUES [sic]; and the diary of SUMMER EDWARDS, and enters the following findings of fact and conclusions of law, based upon the evidence, the trial court's personal recollection, and the totality of trial counsel's overall representation in cause number 647853:

\*    \*    \*    \*

3.    Trial counsel's failure to object to the State's alleged misstatement of law during closing argument was not ineffective; and

4.    Applicant has failed to demonstrate that his conviction was improperly obtained.

*McGowen*, p. 4, Supplemental Transcript. Viewing the prosecution's alleged misstatement and trial counsel's performance in the context of the entire trial, this Court concludes that the state court was not objectively unreasonable in finding trial counsel was not ineffective.

The state habeas courts denied relief on this issue. Petitioner fails to show that the state court's determination was contrary to or involved an unreasonable application of *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment on this issue.

## V.   CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 7 ) is **GRANTED**. The petition for a writ of habeas corpus is **DENIED**, and this case is **DISMISSED WITH**

PREJUDICE.  A certificate of appealability is **DENIED**.  Any and all pending motions are

**DENIED** as moot.

The Clerk will provide a copy of this order to the parties.

Signed at Houston, Texas, on this the 26th day of March, 2008.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE